## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Wallace L. Dixon, III,**

        **Petitioner,**

**v.**                                             **Case No. 13-3161-JWL**

**James Heimgartner,**

        **Respondent.**

### <u>MEMORANDUM & ORDER</u>

Wallace L. Dixon, III is a Kansas state inmate.  Following a jury trial, Mr. Dixon was convicted in state court of two counts of felony murder and other offenses arising out of an apartment building explosion on July 29, 2001 in Emporia, Kansas.  He was sentenced to two consecutive life terms (each with no parole eligibility for 20 years) and 120 months consecutive to the life terms.  The Kansas Supreme Court reversed Mr. Dixon's convictions, finding the State's questions and comments during trial concerning Mr. Dixon's contacting counsel prior to his arrest violated Mr. Dixon's right to a fair trial, requiring a new trial.  *State v. Dixon*, 279 Kan. 563 (2005) (*Dixon I*).

Following the second jury trial, Mr. Dixon was again convicted of two counts of felony murder and other offenses.  He was sentenced to two consecutive life terms and 111 months consecutive to the life terms.  The Kansas Supreme Court affirmed Mr. Dixon's convictions and sentence.  *See State v. Dixon*, 289 Kan. 46 (2009) (*Dixon II*).  Thereafter, Mr. Dixon initiated state post-conviction proceedings pursuant to K.S.A. § 60-1507, but was denied relief in the trial court and on appeal to the Kansas Court of Appeals.  The Kansas Supreme Court denied review.

Mr. Dixon has now filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254 and, with the assistance of counsel, a supplement to that petition.  As will be explained, the petition is denied.

## I.      Background

The facts underlying Mr. Dixon's felony-murder convictions, as determined by the Kansas Supreme Court on Mr. Dixon's direct appeal, are as follows.[1]  At approximately 9 a.m. on July 29, 2001, an explosion and fire destroyed a building containing five townhouse apartment units in Emporia, Kansas.  *Dixon I*, 279 Kan. 563, 565 (2005).  The explosion and fire resulted in the deaths of Dana Hudson and her infant son, who lived in the middle apartment, as well as injuries to other residents and those who attempted to assist at the scene.  *Id*. at 565-66; *Dixon II*, 289 Kan. 46, 49 (2009).  The explosion and fire originated in the apartment unit of Alicia Shaw.  Alicia's sister, Schelese Shaw, lived in Topeka with Mr. Dixon.  *Dixon I*, 279 Kan. at 566.

On one occasion prior July 29, after quarreling with Mr. Dixon, Schelese Shaw removed her things from his house and went to stay with Alicia Shaw.  *Id*.  Schelese Shaw returned home with Mr. Dixon one day later after Mr. Dixon banged on Alicia Shaw's apartment door and threatened to blow up Alicia Shaw's car if Schelese Shaw did not come out of the apartment.  *Id*.  On the evening of July 28, 2001, Alicia Shaw drove to Topeka and picked up Schelese, who

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct."  Although this presumption may be rebutted by Mr. Dixon, he has not challenged any of the factual determinations made by the Kansas Supreme Court in *Dixon I* and incorporated by reference in *Dixon II*.

told her that she was leaving Mr. Dixon. *Id.* While the sisters were still in Topeka, Mr. Dixon began calling the sisters' cell phones. *Id.* Schelese told Mr. Dixon that they were heading to a bar in Emporia (in fact, the sisters never left Topeka that night) and Mr. Dixon was angry. *Id.* Cell phone records showed that Mr. Dixon called Schelese's cell phone 95 times in the 15–hour period between 9:11 p.m. on July 28 and 12:12 p.m. on July 29. *Id.* He called Alicia's cell phone and her apartment phone a total of 20 times during approximately the same period. *Id.*

At some point during the evening, Mr. Dixon asked some friends to go with him to Emporia. *Id.* Just after midnight, Mr. Dixon drove his vehicle from Topeka to Emporia with Rodney Hayes, Jerry Hall, and Ethan Griffin. *Id.* They stopped first at the bar that Schelese Shaw had identified as her destination for the evening and then went to an after-hours party at a house. *Id.* Later, after riding around awhile, they went to the apartment complex where Alicia Shaw lived. *Id.* The four men broke into the apartment. *Id.* at 567. Mr. Dixon was angry, and he was barking orders to his friends. *Id.* The men took a television, a jewelry box, a video cassette recorder and a lamp. *Id.* Afterwards, the men drove around while Mr. Dixon continued to make calls on his cell phone. *Id.* At one point, during an altercation between Mr. Dixon and Mr. Hayes, Mr. Dixon fired his gun at Mr. Hayes' feet until it was empty. *Id.* Mr. Dixon drove by Alicia Shaw's apartment building at least four or five times. *Id.* He later drove to a gas station and had Mr. Griffin pump gasoline into a bucket, which was then placed in the back seat between Mr. Griffin and Mr. Hall. Mr. Griffin heard Mr. Dixon say, "I'll burn it up." *Id.* Mr. Griffin ultimately threw the bucket out of the car window at Mr. Dixon's direction after Mr. Hayes, Mr. Griffin, and Mr. Hall complained about the smell of the gasoline, its sloshing out of the bucket, and their inability to smoke with it in the vehicle. *Id.*

3

Thereafter, Mr. Dixon left Mr. Hayes and Mr. Hall at the residence of Donnie Wishon, one of Mr. Hall's friends. Mr. Dixon and Mr. Griffin went back to Alicia Shaw's apartment. *Id*. Mr. Griffin testified that, after again entering the apartment, Mr. Dixon went upstairs, threw a candle, knocked over a television, and kicked a bookshelf. *Id*. Back downstairs, Mr. Dixon tore a curtain off a front room window, rifled through the kitchen cabinets, and knocked the stove onto its side. *Id*. It was full daylight when Mr. Dixon and Mr. Griffin returned to Mr. Wishon's residence to wake up Mr. Hayes and Mr. Hall and urge them to hurry so they could head back to Topeka. *Id*.

Peter Lobdell, a special agent, certified explosives specialist, and certified fire investigator with the federal Bureau of Alcohol, Tobacco, and Firearms, led the team that investigated the explosion and fire. *Id*. at 567-68. He determined from the large debris field and large sections of intact walls which had been blown out that the explosion was a fuel-air explosion. *Id*. at 568. The fuel was natural gas, which combined with air to support combustion. *Id*. The source of the natural gas was a leak in the pipe that supplied fuel to Alicia's stove. *Id*. According to Agent Lobdell, "the supply pipe was manually manipulated," which caused "it to fail, to leak and emit gas into the apartment." *Id*. He was unable to determine what ignited the fuel-air combination. *Id.*

## II.    Applicable Standards

28 U.S.C. § 2254 governs the review of habeas petitions and focuses on how the state court resolved the claim. *Williams v. Trammell*, 782 F.3d 1184, 1191 (10th Cir. 2015) (citing *Byrd v. Workman*, 645 F.3d 1159, 1165 (10th Cir. 2011)). For claims that the state court

adjudicated on the merits, the court will grant habeas relief only if a petitioner establishes that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of facts in light of the evidence presented in the State court proceeding." *Id*. (quoting 28 U.S.C. § 2254(d)(1)-(2)).

Moreover, a federal court cannot grant a state prisoner's habeas petition unless the petitioner has exhausted his claims in state court. *Frost v. Pryor*, 749 F.3d 1212, 1231 (10th Cir. 2014). For a claim to be exhausted, the "state prisoner must give state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *Id*. The claim will be deemed exhausted, however, if it is now too late to pursue relief in state court. *Velarde v. Archuleta*, ___ Fed. Appx. ___, 2016 WL 362491, at *3 (10th Cir. Jan. 29, 2016) (citing *Gray v. Netherland*, 518 U.S. 152, 161 (1996) (exhaustion requirement "is satisfied if it is clear that the habeas petitioner's claims are now procedurally barred under state law."); *Coleman v. Thompson*, 501 U.S. 722, 732 (1991) ("A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him.")). As the Circuit has recognized, however, "exhaustion in this manner is not much advantage" to a § 2254 petitioner. *See id*.

"[T]he procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." *Id*. (quoting Gray, 518 U.S. at 162). "Cause excusing a procedural default must be

some objective factor external to the habeas petitioner, not fairly attributable to him, that impeded his efforts to comply with the procedural rule in question." *Id.* (quoting *Spears v. Mullin*, 343 F.3d 1215, 1255 (10th Cir. 2003)).  And the prejudice prong requires the applicant to show "actual prejudice as a result of the alleged violation of federal law." *Fairchild v. Trammell*, 784 F.3d 702, 719 (10th Cir. 2015).

## III.    Claims Concerning Alleged Trial Court Errors

*A. Procedurally Barred Claim*

In his petition, Mr. Dixon contends that the trial court erred by refusing to sequester Kansas Bureau of Investigation Agent William Halvorsen during the second trial such that Agent Halverson was able to tailor his testimony after hearing Ethan Griffin's testimony. Mr. Dixon first raised this claim in his post-conviction K.S.A. § 60-1507 motion and the trial court held that the claim was procedurally defaulted because Mr. Dixon had not raised the issue on direct appeal.  Mr. Dixon, then, has procedurally defaulted this claim and the state court's procedural bar rule is "independent" and "adequate."  *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (a federal court may not review a claim if the decision by the state court rests on a state law ground that is independent of the federal question and adequate to support it); *Bowen v. Kansas*, 295 Fed. Appx. 260, 263-64 (10th Cir. 2008) (state court's refusal to consider claim raised in state habeas motion because the claim should have been but was not raised on direct appeal was an independent and adequate basis on which state court could reject claim).

6

The court, then considers whether Mr. Dixon has shown "cause and prejudice" sufficient to overcome the procedural default.[2]  In his petition, Mr. Dixon explains that he did not raise this issue on direct appeal because his appellate counsel failed to raise it.  In certain circumstances, counsel's ineffectiveness in failing properly to preserve a claim for review in state court will suffice to excuse a procedural default.  *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).  However, an ineffective assistance of counsel claim must itself be presented to the state courts as an independent claim before it may used to establish cause for a procedural default.  *See id*. at 452.  If the ineffective assistance claim is itself procedurally defaulted, it cannot be used to establish cause excusing procedural default of the other constitutional claim unless the petitioner has also established cause excusing default of the ineffective assistance claim.  *Id*. at 453.

Mr. Dixon raised ineffective-assistance-of-appellate-counsel claims in his state habeas motion, but he failed to appeal those claims to the Kansas Court of Appeals following the denial of his state habeas motion.  The Kansas Court of Appeals expressly deemed those claims "waived and abandoned."  *Dixon v. State*, 2012 WL 2924545, at *4 (Kan. Ct. App. 2012).  Mr. Dixon does not (and, in any event, cannot[3]) assert another layer of cause to excuse his failure to appeal this ineffective assistance claim to the Kansas Court of Appeals in his state habeas

---

[2] A petitioner may also overcome the procedural default by showing a "fundamental miscarriage of justice."  That exception, however, is "extremely narrow" and is "implicated only in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent."  *Murray v. Carrier*, 477 U.S. 478, 496 (1986).  To prevail, a petitioner must identify evidence that affirmatively demonstrates his innocence.  *Schlup v. Delo*, 513 U.S. 298, 327 (1995).  Mr. Dixon does not allege a fundamental miscarriage of justice with respect to this claim.

[3] The Supreme Court has held that an attorney's errors on appeal from an initial-review collateral proceeding do not qualify as cause for a procedural default.  *See Coleman*, 501 U.S. at 757; *Martinez v. Ryan*, 132 S. Ct. 1309, 1320 (2012) (reaffirming that aspect of *Coleman*).

proceedings.  *See Griffin v. Scnurr*, ___ Fed. Appx. ___, 2016 WL 158718, at *8-9 (10th Cir. Jan. 14, 2016).  Thus, any claim for ineffective assistance of appellate counsel cannot establish cause to excuse the procedurally defaulted claim concerning the trial court's refusal to sequester Agent Halvorsen.  This claim, then, is denied.[4]

## B.  Preserved Claims

In his petition, Mr. Dixon contends that the trial court erred by refusing to grant a mistrial on two occasions—after the State's expert witness, Agent Peter Lobdell, testified differently at the second trial than he did at the first trial and after a juror allegedly saw Mr. Dixon wearing "shackles" or leg restraints in the courthouse hallway.  In *Dixon II*, the Kansas Supreme Court addressed and rejected both of these claims.  With respect to the testimony of the expert witness, the record reflects that Agent Lobdell testified at the first trial that the stove could not have been situated on its side during the explosion.  This testimony, then, conflicted with testimony from one of Mr. Dixon's accomplices that he saw Mr. Dixon kick the stove and that the stove was lying on its side when he and Mr. Dixon left the apartment.  At the second trial, Agent Lobdell suggested that the stove could have been either on its side or upright at the time of the explosion and that he had no way to be certain.  Mr. Dixon's trial counsel objected to this testimony on the grounds that it was a material and prejudicial change from Agent Lobdell's prior testimony and his written report.  Agent Lobdell acknowledged at trial that he had said during the first trial that he did not think the stove could have been on its side, but reiterated that his ultimate opinion—

---

[4] Because Mr. Dixon has failed to demonstrate cause for his procedural default, the court need not reach the question of actual prejudice.  *See Coleman*, 501 U.S. at 750.

that the pipe had been manipulated, creating a gas leak, and that the explosion was caused by an intentional incendiary act—remained unchanged. *Dixon II*, 289 Kan. 46, 51 (2009). The trial court denied Mr. Dixon's motion for a mistrial after explaining that, in the court's view, Agent Lobdell had not altered his opinion but had simply expanded his opinion and, in any event, there was no prejudice to Mr. Dixon because other evidence in the case, including other expert reports, had put Mr. Dixon on notice that there were questions about the position of the stove at the time of the explosion. *Id*. at 51-52.

Affirming the trial court's denial of the motion for mistrial, the Kansas Supreme Court highlighted that the discrepancy was "relatively minor," that it was not known to the State prior to Agent Lobdell's testimony, and that it was not prejudicial to Mr. Dixon because, even without Agent Lobdell's change, there was "a great deal of inconsistency" as to the position of the stove. *Id*. at 57-58. In his habeas petition, Mr. Dixon does not even suggest that the Kansas Supreme Court's decision was contrary to or an unreasonable application of federal law and he directs the court to no Supreme Court case undermining the Kansas Supreme Court's decision on this issue in any respect. Neither has Mr. Dixon alleged that the Kansas Supreme Court based its decision on an unreasonable determination of the pertinent facts. Because the Kansas Supreme Court's decision that Agent Lobdell's testimony did not warrant a mistrial was not contrary to or an unreasonable application of Supreme Court law, and was not based on an unreasonable determination of the facts, this claim must be denied.

With respect to the juror seeing Mr. Dixon wearing leg restraints, the Kansas Supreme Court held that the trial court committed no error in refusing to grant a mistrial because Mr. Dixon was not forced to wear shackles in the courtroom and the juror, who may have only

"heard what he believed to be shackles," apparently saw Mr. Dixon in the courthouse hallway rather than in the courtroom itself. *Dixon II*, 289 Kan. at 61 ("We think it highly unlikely that any juror in a double homicide case would be shocked or, for that matter, improperly influenced merely because the accused is transported securely."). Moreover, the trial court questioned the juror over the incident and gave a specific curative admonishment to the entire jury. *Id.* at 61-62. Mr. Dixon cannot establish that the Kansas Supreme Court's decision was contrary to or an unreasonable application of the Supreme Court's decision in *Deck v. Missouri*, 544 U.S. 622 (2005), which holds that the Constitution forbids the use of visible shackles in the courtroom during a capital case, or that it was based on an unreasonable determination of the facts, which are undisputed by Mr. Dixon.

Mr. Dixon next contends that he is entitled to habeas relief based on the trial court's failure to give a unanimity instruction on the predicate felony for his burglary convictions, which supported the felony-murder charges. The Kansas Supreme Court rejected this claim and held that, in an alternative means case (rather than a multiple acts case) unanimity is required as to guilt for the single crime charged but is not required as to the means by which the crime was committed so long as substantial evidence supports each alternative means. *Dixon II*, 289 Kan. at 66. Because there was sufficient evidence supporting each of the alternative predicate felonies for the burglaries, the court rejected the unanimity instruction argument. *See id.* This decision is consistent with the Supreme Court's decision in *Schad v. Arizona*, 501 U.S. 624 (1991), which held that due process does not require unanimity from a state court jury on the various means or theories of committing a single offense charged, and Mr. Dixon does not contend otherwise. This claim, then, must be denied.

10

According to Mr. Dixon, the trial court also erred by admitting evidence that Mr. Dixon's mother, on the morning of the explosion, attempted to persuade the Shaw sisters not to go to the police with their suspicions about Mr. Dixon's involvement in the explosion. Mr. Dixon asserts that the prejudice resulting from the admission of this evidence was so great as to render his trial fundamentally unfair. The Kansas Supreme Court affirmed the trial court's admission of the evidence because that evidence was material to Mr. Dixon's possible consciousness of guilt in light of the timing and content of the conversation. *Dixon II*, 289 Kan. 46, 69-70 (2009). The Kansas Supreme Court also found the evidence was not unduly prejudicial, finding that it was "impossible" in light of the other evidence of Mr. Dixon's guilt, that "any juror's vote on guilt turned on Dixon's mother's evidently misguided . . . effort to help her son." *Id*. at 70. The Kansas Supreme Court's conclusion that the admission of this evidence did not affect the jury's guilt determination was not contrary to federal law or an unreasonable determination of the facts. Indeed, as highlighted by the Kansas Supreme Court, there was ample evidence supporting Mr. Dixon's felony murder convictions. Because federal habeas corpus does not permit the general review of questions concerning the admissibility of evidence under state evidentiary rules, and because Mr. Dixon cannot establish that the evidence was so "grossly prejudicial" as to "fatally infect" his trial, the claim must be denied. *See Bullock v. Carver*, 297 F.3d 1036, 1055 (10th Cir. 2002).

Mr. Dixon contends in his petition that the trial court erred by refusing to instruct the jury on lesser-included offenses of felony murder. Because the Supreme Court has never recognized a federal constitutional right to a lesser included offense instruction in non-capital cases, the Tenth Circuit has established a rule of "automatic non-reviewability" in the federal habeas

context for claims based on a state court's failure, in a non-capital case, to give a lesser included offense instruction. *Dockins v. Hines*, 374 F.3d 935, 938 (10th Cir. 2004). This claim, then, fails.

Mr. Dixon also asserts that the trial court erred in its instructions to the jury on the elements of burglary by failing to explain to the jury what makes "criminal damage to property," one of the alternative predicate felonies for the burglary, a felony rather than a misdemeanor. The Kansas Supreme Court addressed the merits of this claim and expressly held that the trial court's instructions "fairly and accurately state the law." *State v. Dixon*, 289 Kan. 46, 68-69 (2009). This court, then, is bound by that ruling. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus).

Lastly, Mr. Dixon asserts that the combination of errors committed by the trial court deprived him of his constitutional rights. The cumulative-error doctrine applies in the federal habeas context only where there are two or more actual constitutional errors. *Jackson v. Warrior*, 805 F.3d 940, 955 (10th Cir. 2015) (citing *Thacker v. Workman*, 678 F.3d 820, 849 (10th Cir. 2012)). That is not the case here and Mr. Dixon's argument is unavailing.

## IV.    Claims Asserting Ineffective Assistance of Counsel[5]

### A.    *Procedurally Barred Claims*

---

[5] Mr. Dixon asserts that he received constitutionally deficient representation from his attorneys in his K.S.A. § 60-1507 state post-conviction proceedings. Because federal habeas petitioners may not raise the ineffectiveness or incompetence of counsel during collateral post-conviction proceedings as a "ground for relief" in habeas proceedings, 28 U.S.C. § 2254(i), this claim necessarily fails.

Mr. Dixon contends that his Sixth Amendment rights were violated by his trial counsel's failure to request certain jury instructions; failure to bring a motion to set aside the verdict; failure to impeach William Halvorsen; failure to object to the admission of pictures of Ms. Shaw's apartment; failure to object to improper closing argument; failure to call Gregory Aluise as a witness; failure to impeach Alicia Shaw; failure to move to sever the two burglary counts; failure to call Larry Warren as a witness; and failure to trace ownership of the handgun to a co-defendant.  He also contends that his Sixth Amendment rights were violated by his appellate counsel's failure to raise these (and one additional[6]) ineffective assistance claims on direct appeal.  Without exception, each of these claims was raised in Mr. Dixon's K.S.A. § 60-1507 petition but then abandoned on appeal.  These claims, then, are procedurally defaulted.  *See Velarde v. Archuleta*, ___ Fed. Appx. ___, 2016 WL 362491, at *3 (10th Cir. 2016).

The procedural bar prevents this court from reviewing the defaulted claims unless Mr. Dixon can demonstrate cause and prejudice for the default.  *See id.*  As noted, Mr. Dixon raised these claims in his state habeas motion, but he failed to challenge on appeal the district court's denial of those claims.  *See Dixon v. State*, 2012 WL 2924545, at *3 (Kan. Ct. App. 2012).  Mr. Dixon contends that his failure to raise those issues on appeal in his state habeas proceedings is the fault of his appellate counsel in the state habeas proceedings.  The Supreme Court, however, has held that an attorney's errors on appeal from an initial-review collateral proceeding do not qualify as cause for a procedural default.  *See Coleman*, 501 U.S. at 757; *Martinez v. Ryan*, 132 S. Ct. 1309, 1320 (2012) (reaffirming that aspect of *Coleman*).  Thus, any claim for ineffective

---

[6] Mr. Dixon contends in his petition that appellate counsel was ineffective for failing to raise on direct appeal that his trial counsel was ineffective for failing to object to the admissibility of an audio recording played to the jury during the State's case.

assistance of appellate counsel in his state habeas proceedings cannot establish cause to excuse the procedurally defaulted claims concerning the alleged ineffectiveness of his trial and appellate counsel.  These claims, this, are denied.[7]


B.      *Preserved Claims*

Mr. Dixon asserted several ineffective assistance claims in connection with his state post-conviction proceedings pursuant to K.S.A. § 60-1507, including certain claims that the trial court reserved for an evidentiary hearing:  trial counsel's failure to call four specific witnesses to testify at trial (Donnie Wishon; Cledis Robinson; Rick Wiseback; and Neil Hartley) and trial counsel's failure to adequately cross-examine Mr. Griffin regarding his inconsistent testimony between the first and second trials.  *Dixon v. State*, 2012 WL 2924545, *3 (Kan. Ct. App. July 13, 2012).  After an evidentiary hearing, the trial court concluded that Mr. Dixon had not shown that trial counsel's performance fell below the standard of reasonably effective counsel and that Mr. Dixon had failed to show there was a reasonable probability that but for trial counsel's performance, the outcome of the trial would have been different..  *Id*. at *4.  On appeal, the Kansas Court of Appeals declined to evaluate the district court's findings regarding counsel's performance and focused only on the prejudice aspect of Mr. Dixon's claims.  *Id*. at *7.  In doing so, the Kansas Court of Appeals affirmed the trial court, finding that the trial court's factual findings were supported by substantial competent evidence sufficient to support the trial court's conclusions of law.  *Id*. at *5-8.

---

[7] Because Mr. Dixon has failed to demonstrate cause for his procedural default, the court need not reach the question of actual prejudice.  *See Coleman*, 501 U.S. at 750.

Because the Kansas Court of Appeals rejected Mr. Dixon's ineffective assistance claims on the merits, the court must evaluate these claims through AEDPA's deferential lens. *See Frost v. Pryor*, 749 F.3d 1212, 1225 (10th Cir. 2014) (citing 28 U.S.C. § 2254(d)(1)). The court, then, may grant relief only if Mr. Dixon demonstrates that the Kansas Court of Appeals' decision was "contrary to, or involved an unreasonable application of, clearly established" Supreme Court law. *Id.* (citing 28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 131 S. Ct. 770, 783–84 (2011)). In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court held that a defendant, to prove an ineffective assistance claim, must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Id.* at 1224 (citing *Strickland*, 466 U.S. at 687). "[T]he rule set forth in *Strickland* qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Id.* at 1225 (quoting *Williams v. Taylor*, 529 U.S. 362, 391 (2000)). To establish prejudice for purposes of *Strickland*, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

In rejecting Mr. Dixon's claims, the trial court held that there was "no evidence" presented at the hearing that would have "even raised the probability that there would have been a different outcome" but for trial counsel's performance. *Dixon v. State*, 2012 WL 2924545, at *4. In assessing that decision, the Kansas Court of Appeals also applied the "reasonable probability" standard. *Id.* at *5. Nonetheless, the court may still grant relief if the state court applied that standard "unreasonably." *Frost*, 749 F.3d at 1225 (quoting 28 U.S.C. § 2254(d)(1)). Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is

15

even more difficult than establishing a *Strickland* claim.  *Id*. (citations omitted).  Indeed, a state court decision will be deemed reasonable "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Id*. (quoting *Richter*, 131 S. Ct. at 785).  Under the "fairminded jurists" test, Mr. Dixon, to obtain relief, must demonstrate "there is no possibility fairminded jurists could disagree" that he met his burden before the Kansas Court of Appeals to show a reasonable likelihood of a different result if his trial counsel had called the witnesses to testify or cross-examined Mr. Griffin more thoroughly.

In his petition, Mr. Dixon contends that his Sixth Amendment rights were violated by his trial counsel's failure to call certain witnesses to testify at trial:  Donnie Wishom (who allegedly would have testified that there were stolen items in his apartment that night that did not come from Ms. Shaw's apartment, suggesting that Mr. Halls and Mr. Hayes committed additional burglaries that night and did not stay at Mr. Wishom's residence as they had claimed); Cledis Robinson (a friend of Alicia Shaw, who allegedly would have testified that many people had keys to Ms. Shaw's apartment such that there could have been "numerous possible perpetrators"); Rick Wiseback (an employee at the Shawnee County jail who allegedly would have testified that Terry Jones, Mr. Dixon's cellmate, was planning to use newspaper articles and Mr. Dixon's legal papers against Mr. Dixon in the hopes of a sentence reduction in his own case); and Neil Hartley (a private investigator hired by Mr. Dixon's counsel who allegedly could have explained to the jury how Mr. Dixon knew details about the crime scene, to counter the State's suggestion that Mr. Dixon had knowledge of details that he could not have known if he had not been at the crime scene).  The trial court rejected these claims on the grounds that, even if those witnesses had testified as Mr. Dixon proffered during the evidentiary hearing, Mr.

Dixon had failed to show a reasonable probability that the outcome of the trial would have been different. *Dixon v. State*, 2012 WL 2924545, at *4.

In affirming the trial court's conclusion that the testimony of these witnesses would not have affected the outcome of trial, the Kansas Court of Appeals explained:

> At best, Wishon's testimony would have impeached Hayes' and Hall's credibility, but as the district court noted, the credibility of these two witnesses was already substantially impeached at trial based on numerous inconsistencies in their testimony. And Robinson would not have been a material witness even if he had testified that Alicia's apartment was known as a "party house" and he had a key to the apartment.
>
> Wiseback's testimony may have been helpful if, in fact, he could have impeached the trial testimony of Jones, the jailhouse informant. Based on Dixon's testimony at the evidentiary hearing, Wiseback only would have testified that he told Dixon to stay away from Jones because Jones was trying to cut a deal in his own case. But Jones readily admitted this fact at trial. And unless Wiseback somehow monitored every interaction between Dixon and Jones during the several weeks that they were cellmates, he could not have testified that Dixon and Jones never had an opportunity to conspire with each other at the jail. Finally, Hartley's testimony may have been helpful to the extent that it may have explained how Dixon learned information about the case that had not been released to the public. But during closing argument, Bartee pointed out that there were many ways Dixon could have learned this information, including through law enforcement officers and the accomplices involved in the case.
>
> As the district court pointed out, there was substantial evidence against Dixon at the second trial. Alicia testified that Dixon was angry at Schelese for leaving him and that Dixon had called her and Schelese 108 times during the night, including a phone call from Alicia's home phone located inside her apartment. Alicia's friend, who was with Alicia when she spoke to Dixon, heard Dixon say that "[e]verybody's shit's going up in flames." Griffin, Hayes, and Hall—the three men with Dixon during the events leading up to and after the explosion—testified that they were with Dixon during the first break-in. They also testified that after the first break-in, Dixon instructed Griffin to put gasoline in a bucket; the men denied knowing the intended use for the gasoline. Griffin testified that he heard Dixon say, "I'll burn it up," although he eventually instructed Griffin to throw the gasoline out the window.

> Concerning the second break-in, Griffin, Hayes, and Hall each testified that Griffin returned to Alicia's apartment with Dixon.  Griffin testified that Dixon " tore up" the living room, "trashed" the kitchen, and  "kicked" or "pushed" the stove.  Hayes testified that Griffin told him Dixon had gone "crazy" during the second break-in at Alicia's and that Dixon had "grabbed" or "pulled" the stove, which started hissing and seeping gas; other evidence established that Dixon told several different stories to police and he had tried to bribe two eventual jailhouse informants, including his cellmate Jones, to testify to a fictional account of the events.  Given the strength of the evidence against Dixon at the second trial, we conclude the district court did not err in finding that Dixon had failed to establish how he was prejudiced by Bartee's decision not to call the four witnesses.

*Id.* at *7-8 (citations omitted). Mr. Dixon does not demonstrate or even suggest that the Kansas Court of Appeal's application of *Strickland* was unreasonable and this court's review of that decision reveals no possibility that the jury's verdict would have been different if these witnesses had testified in the manner described by Mr. Dixon.  This is particularly true in light of the significant evidence of guilt against Mr. Dixon—evidence which came from a variety of sources.  There is simply no question in the court's mind that the state court reasonably applied *Strickland* to the facts of this case.

Mr. Dixon contends that his trial counsel failed to adequately cross-examine Mr. Griffin concerning inconsistent testimony provided by Mr. Griffin between the first and second trials. According to Mr. Dixon, Mr. Griffin testified at the second trial that he *saw* Mr. Dixon knock over the stove in Ms. Shaw's apartment and that Mr. Griffin did not testify to seeing Mr. Dixon knock over the stove at the first trial.  *Id.* at *8.   As the Kansas Court of Appeals noted, however, the record does not reflect that Mr. Griffin testified at the second trial that he actually saw Mr. Dixon knock over the stove.  Moreover, Mr. Griffin was treated as a hostile witness during the State's direct examination of him and numerous inconsistencies between Mr. Griffin's testimony concerning the stove during the first and second trials were highlighted for

18

the jury by the State even before he was cross-examined by Mr. Dixon's trial counsel. *See id*. The trial court, then, held that any inconsistencies in Mr. Griffin's testimony had been adequately explored at trial, *id*. at *4, and the Kansas Court of Appeals held that the trial court's finding was supported by substantial competent evidence in the record. *Id*. at *8.

In his petition, Mr. Dixon does not articulate how the Kansas Court of Appeal's ruling on this claim was so unreasonable that "there is no possibility fairminded jurists could disagree" over the correctness of the decision. This court, in reviewing the Kansas Court of Appeals decision under the applicable standard of review, easily concludes that the Kansas Court of Appeals did not unreasonably apply *Strickland*'s prejudice standard to Mr. Dixon's claim. There is simply no reason to believe that any additional cross-examination of Mr. Griffin or highlighting any additional inconsistences in his testimony would have altered the jury's perception of Mr. Griffin or his testimony or, more specifically, would have altered the outcome of the case. For the foregoing reasons, Mr. Dixon is not entitled to habeas relief on his *Strickland* claims.

Finally, Mr. Dixon asserts that the cumulative effect of the errors committed by his trial counsel, appellate counsel and post-conviction counsel, separately and/or together, deprived him of his constitutional rights. As noted earlier, the cumulative-error doctrine applies in the federal habeas context only where there are two or more actual constitutional errors. *Jackson v. Warrior*, 805 F.3d 940, 955 (10th Cir. 2015) (citing *Thacker v. Workman*, 678 F.3d 820, 849 (10th Cir. 2012)). Mr. Dixon has not identified one actual constitutional error in this case and, accordingly, his cumulative-error argument necessarily fails.

## V.      Remaining Claims

In his supplemental petition, Mr. Dixon contends that "newly discovered evidence" undermines the reliability of his convictions.  Specifically, Mr. Dixon contends that a "small gas fire" due to a gas leak occurred at Ms. Shaw's apartment building approximately one year prior to the explosion.  Mr. Dixon suggests that this evidence supports an alternative, maintenance-related source of the gas leak that led to the explosion.[8]  The source of this evidence, however, is Greg Aluise, the maintenance supervisor at the apartment building during the relevant time period.  Mr. Aluise was identified as a potential witness in the information charging Mr. Dixon and Mr. Dixon could easily have interviewed Mr. Aluise prior to trial.  Moreover, even Mr. Dixon admits in his supplemental petition that his trial counsel "was aware of the probability that gas leaks occurred at the apartment complex, establishing evidence of an alternative cause of the explosion."  Clearly, the evidence concerning a prior gas fire was either known to trial counsel or could have been readily discovered with the exercise of due diligence.  The evidence, then, is not new.[9]

Finally, Mr. Dixon references, almost in passing, his Sixth Amendment right to be tried before a jury selected from a fair cross section of the community.  It is not clear to the court whether Mr. Dixon intends to assert a claim on this basis but that claim would fail in any event. To begin, the claim was not raised below, it has been defaulted, and Mr. Dixon identifies no

---

[8] Mr. Dixon does not assert a claim of innocence based on this evidence but suggests that it would have provided the jury with an "alternative theory to acquit Mr. Dixon."

[9] As noted earlier, Mr. Dixon asserted in his § 60-1507 petition a claim for ineffective assistance of counsel based on trial counsel's failure to call Mr. Aluise as a witness at trial.  The record reflects, however, that Mr. Dixon's counsel expressly waived that claim during oral argument before the state district court and the claim, as explained earlier, is procedurally defaulted.

cause excusing the default or actual prejudicial resulting from the alleged violation.  Moreover, Mr. Dixon has not demonstrated (or, for that matter, even alleged) that any racial underrepresentation in the jury was the product of systematic exclusion in the selection process, which is required to show a Sixth Amendment violation.  *See Duren v. Missouri*, 439 U.S. 357, 364 (1979).  The claim is denied.

## VI.    Certificate of Appealability

Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts instructs that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Pursuant to 28 U.S.C. § 2253, the court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," and the court "indicates which specific issue or issues satisfy [that] showing."  A petitioner can satisfy the standard by demonstrating that the issues raised are debatable among jurists, that a court could resolve the issues differently, or that the questions deserve further proceedings.  *See Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000).  With respect to the claims denied above, for the same reasons stated, Mr. Dixon has not satisfied the requisite standard.  The court concludes that a certificate of appealability should not issue in this case.

## VII.    Conclusion

After careful review of the record, the court concludes that Mr. Dixon has not established that he is in custody in violation of the Constitution or laws of the United States.  Therefore, the petition for a writ of habeas corpus is denied.

**IT IS THEREFORE ORDERED BY THE COURT THAT** Mr. Dixon's petition for writ of habeas corpus is **denied** and the court declines to issue a certificate of appealability.

**IT IS SO ORDERED.**

Dated this 6th day of May, 2016, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge